**JAMAIL, INC., Plaintiff,**

v.

**The CARPENTERS DISTRICT COUN-
CIL OF HOUSTON PENSION AND
WELFARE TRUSTS, Defendants.**

**Civ. A. No. H–88–1877.**

United States District Court,
S.D. Texas.

Dec. 4, 1990.

L.G. Clinton, Jr., Houston, Tex., for plaintiff.

Richard J. Davis, Los Angeles, Cal., for defendants.

## OPINION ON SUMMARY JUDGMENT

HUGHES, District Judge.

### 1. *Introduction.*

This case was submitted to the court on a stipulated record and cross motions for summary judgment. The question is: Does an employer have a right of restitution for an employer's overpayment to an ERISA plan? Although no action is available directly under ERISA, the federal common law of restitution applies. Jamail will be awarded the overpayment.

### 2. *Facts.*

Jamail, Inc., is a small construction company in Galveston, Texas. It is owned and operated by 24 year-old Jim Jamail. The company signed four collective bargaining agreements with the Houston District Council of Carpenters Pension Fund and the Houston District Council of Carpenters Health & Welfare Trust (trusts). Both trusts are employee benefit plans covered by ERISA. Employee Retirement Income Security Act of 1974, § 3; 29 U.S.C. § 1002. Only part of Jamail's work is done under these contracts. The other work is done under other union contracts or is done under no agreement.

In October 1986, the Carpenters Union notified Jamail that it was going to audit Jamail's records under the agreements between Jamail and the union, which were per job contracts. Jamail responded that "we will comply with your request and will follow Sec. 6.5 of the agreement." Jamail requested the name and address of the accounting firm that would conduct the audit and asked for 180 days to collect the time cards and other employee records under the agreements, reminding the union that "all employees are not union members and have a right to keep their wages confidential and ... our reports reflect all underlying employees, union and non-union."

The accounting firm of Hopson Fedders & Co. wrote Jamail that the audit would cover October 1, 1983, through September

30, 1986, and that Jamail should pick a convenient time for the audit. On November 7, 1986, Jim Jamail sent George Fedders a letter acknowledging his request and saying,

> We are not a union contractor, but have signed a wage participation agreement only, which enables the benefits to be accepted. To open our entire set of payroll records to you, I believe is not covered under our wage participation agreements.
>
> Although we do wish to cooperate in a manner that provides you with the necessary information and does not compromise the payroll and tax records that do not apply, as of yet I have not determined the method to do that but I am open to suggestions.

The union's collection lawyer replied, threatening litigation if Jamail refused an audit. On November 26, 1986, Jamail wrote the union's lawyer, stating,

> I also am aware of the governing policies which we all must abide. In my letter to Mr. Fedders I did not refuse to submit to an audit, but rather asked for clarification of the method. I feel your letter has taken a rather harsh approach to a reasonable question. I understand the intention of the audit is to verify proper contributors to the employer for union employees, I simply asked how this could be done without compromising the privacy of the individuals who are not participating in the wage participation agreements.
>
> I expect reasonable answers to this question and not to be read the governing laws and threats. We have paid many thousands of dollars into this participation agreement, part of which I am sure your fees are paid from. We are not the "bad guy," but rather an important entity to yourself, the union, and my union employees. Without us you lose, the union loses and the employee loses. I suggest that in the future you consider the whole picture. "Don't miss the forest for the trees."

The audit that was conducted on February 27, 1987, revealed that Jamail had made payments for employees not covered by the union contracts totaling $51,434. Jamail had made all other payments that he should have made. Jamail demanded a refund of the excess. The trusts offered him only $1,146 (2% of the overpayment). That was calculated as the overpayments in the last six months of $1,746, minus an administrative audit fee of $600 (35% of the allowed refund). Jamail has sued in district court for the return of $51,434.68.

### 3. *Plan Policy.*

On February 10, 1987, the collection subcommittee of the trustees of the Union reported in their minutes that Jamail had agreed to an audit. On the next day, the trusts through the trustees adopted a policy that mistaken payments would only be refunded for the six months immediately before the trusts are notified of the overpayment. The minutes noted that the Houston Chapter of the Associated General Contractors would distribute the new policy statement to its members. Jamail is not a member of the Houston Chapter of the Associated General Contractors.

If the plan adopts a policy of no reimbursements, then under the trusts' theory, the employer would simply lose its interest in excess payments. The arbitrary nature of the deadline for reimbursements is shown by the cutoff occurring in about one-quarter of the time it takes the trusts to discover that an over-payment has actually been made. Simple justice seems to suggest a directly reciprocal limit; recovery of underpayments and refund of overpayments should be possible for an equal period. No trust need was articulated that requires the short fuse for one and a long fuse for the other. The trusts did argue, without factual elaboration, that they had already shifted their actuarial calculations based on the contributions' assumed accuracy, but underpayments are as much, if not more, of a distortion as a base for trust decisions.

### 4. *Statutory Text.*

■ Because an employer is not listed among the parties authorized to bring a

suit, the statute does not expressly allow an action by Jamail. 29 U.S.C. § 1132(a) (1982). "Participants, beneficiaries, fiduciaries, and the Secretary of Labor are authorized to file a wide variety of civil suits to obtain enforcement or clarification of obligations arising under ERISA or under an employee benefit plan, but Section 502(a) does not authorize contributing employers to bring any kind of civil action at all." *Dime Coal Co. v. Combs,* 796 F.2d 394, 397 (11th Cir.1986).

### 5. *Implied Action.*

Although the court of appeals for this circuit has not ruled on this issue specifically, it has intimated that a private right of action for mistaken contributions under ERISA does not exist. "While we tend to agree that ERISA does not provide a private right of action to an employer seeking to recover mistakenly overpaid contributions, we do not feel the need to address an issue that has already split the circuits." *South Central United Foods and Commercial Workers Unions v. C and G Markets, Inc.,* 836 F.2d 221, 224 (5th Cir.), *cert. denied,* 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988). Faced directly with this question, this court finds there is no private right of action under ERISA to recover mistaken contributions. *Dime Coal Co. v. Combs,* 796 F.2d 394 (11th Cir.1986).

### 6. *Restitution.*

■ Jamail is entitled to a refund under federal common law of restitution. State restitution law is preempted by ERISA. *Soft Drink Industry Local Union No. 744 Pension Fund v. Coca Cola Bottling Co. of Chicago,* 679 F.Supp. 743, 750–51 (N.D. Ill.1988). Otherwise, the common law action for money had and received would easily cure this problem. *Orgain v. Butler,* 478 S.W.2d 610, 613 (Tex.Civ.App.— Austin 1972).

This conclusion is consistent with the case law that a right of offset existed between overpayments owed to the employer and later accruing payments. *South Central United Foods and Commercial*

*Workers Unions v. C and G Markets, Inc.,* 836 F.2d 221, 224 (5th Cir.), *cert. denied,* 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988). A failure to extend that logic would lead to strange results. Once an overpayment was discovered, employers would be forced to fail to contribute to the trust to be in a position to seek an offset, deliberately allowing their accounts to be in arrears. The limitations on rights of recovery to theories inside the plan are designed to protect the integrity of the plan from the crippling expenses of litigation. While the employer no less than the employee should be barred from the newly-found and ill-conceived torts, the right to recover overpayment has none of the direct adverse potential to the fund that the other actions do. Suits for overpayments are narrowly confined by the requirement that as a predicate the employer must actually have paid into the trust an amount that is, at least plausibly, too much. The payments and the employees they cover are all the subject of multiple formal record-keeping rules, minimizing the risk of gratuitous suits. If ERISA is going to achieve its objective, it should encourage employers to err toward overpayment rather than to slight the fund for fear of irrecoverability.

Irrecoverability could impair an employer's inclination to join the plan in the first place. The trusts have penalties and expenses they can recover if the employer underpays, but they have no incentive to detect overpayments and not to breach their fiduciary duty to the employer.

### 7. *Coverage Derived from Overpayments.*

■ The plan argues that, based on the mistaken payments, it extended benefits to workers who should not have been covered. While this is a potential problem, no fact was presented that these erroneously covered workers made claims attributable to the coverage through Jamail's reports. The pure speculation that that argument represents is easily shown by the recent adoption by the trusts of an arbitrary rule to refuse refunds after six months. No basis of identifiable harm to the trusts has

been articulated for its choice of limitations. No evidence of unanticipated benefit claims or of underfunding has been suggested. The argument from necessity fails wholly.

Funds need to settle their accounts. Employers need to close their books. Neither of these needs to be done abruptly and arbitrarily. These funds have existed for years successfully without a six month limit on refunds, and the adoption and application retroactively of the new rule is irrational and counterproductive.

It would take more unequivocal language than that found in the refund section [ERISA § 403(c)(2)(A)] for us to conclude that Congress intended the potentially absurd consequences which might result if employers have no hope of recovering mistaken overpayments. Not every pension fund will necessarily be administered in a reasonable manner. In the absence of at least an equitable action, there will be no incentive for fund trustees to return overpayments to employers.... We do not imagine that the Congress which passed the 1980 amendments to ERISA intended employers to be completely at the mercy of fund trustees.... Preventing such injustice has always been a function of equity.

*Soft Drink Industry Local Union No. 744 Pension v. Coca Cola Bottling of Chicago,* 679 F.Supp. 743 (N.D.Ill.1988); *Central States, Southeast and Southwest Areas Pension Fund v. Houston Pipe Line Co.,* 713 F.Supp. 1527, 1534 (N.D.Ill.1989).

Holding that a retroactive six months limit is unenforceable as an abuse of the trusts' authority does not imply that there are no limits. Actuarial data on claims from erroneously covered beneficiaries would indicate a range of deductions that could be made from refunds. Other provisions for the demonstrable risk to the funds may be made, including some period of absolute bar. Simple equity might suggest a bar date for refunds that matches the bar date for further assessments. The plan's refusal to refund overpayments older than six months is patently arbitrary because the accounts are only audited, on the average, every four years.

### 8. *Fraud.*

The trusts argue strenuously that allowing employers a right of reimbursement would encourage employers to put sick relatives on the payroll as a ruse to collect benefits and, later, if no medical disaster occurs, to call the trusts' attention to the mistake and demand a reimbursement for the coverage. If there were evidence of this problem, it would be a specific fraud. No fact has been proffered to support the false-employee fraud theory.

Conversely, one could argue that the fund will schedule audits for six months and a day after a known overpayment or a large payment and effectively eliminate any chance of reimbursement under its plan. There is no evidence of fraud, and the court will not assume fraud on either party.

### 9. *Conclusion.*

ERISA should be construed to benefit the employee, but a detriment to the employer is not always a benefit to the employee. Without a right of restitution employers have less incentive to furnish these plans. Also, non-reimbursement would reduce the trustee's level of care in accurate controls, including prompt audits. A judgment will be granted for Jamail for $41,174.47. The number is the overpayment of $51,434.68 minus 20% as an administrative fee to find and remit the overpayment.

### FINAL JUDGMENT

Jamail, Inc., recovers from the Carpenters District Council of Houston Pension and Welfare Trusts $41,147.74 (being $51,434.68 minus 20% administrative fee) and postjudgment interest at 7.28% per year.